UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DARRELL ROGERS, individually,
and on behalf of all others similarly situated,

      Plaintiff,

vs.                                 Case No. 1:18-cv-01567

VIVINT SOLAR, INC., *et al.*,

      Defendants.

_____/

## JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

### and incorporated

## MEMORANDUM OF LAW

Plaintiff, Darrell Rogers, individually and on behalf of the Settlement Class defined herein (hereinafter "Plaintiff" or "Representative Plaintiff"), and Defendants, Vivint Solar, Inc., Vivint Solar Holdings, Inc., and Vivint Solar Developer, LLC (collectively, "Defendants") (together the "Parties"), hereby move the Court for final approval and entry of the Settlement Agreement (hereinafter "Agreement") (D.E. 32-1), agreed to by the Parties in this matter, and preliminarily approved by this Court.[1]

As more fully detailed herein, the reaction of the Settlement Class subsequent to preliminary approval indicates an excellent result – the Parties received nearly 40,000 valid claims and zero (0) objections – and the Parties submit that this reaction, among other factors,

---

[1] On December 2, 2019, this Court granted preliminary approval of the Agreement, and certified the Settlement Class as defined herein pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) ("Updated Preliminary Approval Order"). *See* Updated Preliminary Approval Order, D.E. 33 at ¶ 7 ("The Settlement Agreement is incorporated by reference into this Order and is hereby preliminarily adopted as an Order of this Court.").

supports a finding that the Agreement constitutes a fair, reasonable, and adequate resolution for the Plaintiffs, the Parties and the Settlement Class.  In support of this Motion, the Parties state as follows:

## I.      BACKGROUND

Plaintiff brought this action, individually and on behalf of a group of similarly situated persons, alleging that Defendants violated the Telephone Consumer Protection Act ("TCPA"), and the regulations promulgated under the TCPA, by using an automatic telephone dialing system ("ATDS"), an artificial voice, or a prerecorded voice when they called Plaintiff and the putative class members in order to promote their solar energy business without obtaining Prior Express Written Consent; or by calling Plaintiff and other putative class members on the National Do-Not-Call Registry to promote their solar energy business without obtaining Requisite Do-Not-Call Permission.

Specifically, Plaintiff contends that wide-ranging investigation and discovery has established that, in order to streamline the time-consuming process of door-to-door sales, certain individual sales representatives contracted with an overseas lead generation company, Virtual Sales Solutions ("VSS"), and placed unsolicited robocalls from a now-defunct call center in the Philippines to individuals in the United States.  *See* Exhibit 1, Heller Decl. at ¶ 4.  These robocalls were intended to solicit interest in solar energy, and to set appointments with potential customers with Defendants' sales representatives who paid VSS for the service, without initially disclosing Defendants' identity.  *Id*.  Plaintiff further contends that discovery establishes that Defendants' employees were involved in many facets of VSS's marketing efforts including selecting the zip codes to which calls were placed, mandating the times and dates during which sales appointments could be set, dictating the prequalification information that VSS's agents

were to obtain from the called parties, and helping to generate the information used in the robocalling scripts. *Id*. at ¶ 5. Plaintiff contends that this discovery has produced unique identifying information for approximately 66,000 individuals who were called by VSS on behalf of Defendants during a specific time frame for which records were still available, and which included the calls made to the Representative Plaintiff. *Id*. at ¶ 9. Finally, Plaintiff contends that there is substantial evidence that VSS placed calls for Defendants' sales representatives in geographic regions outside of the Representative Plaintiff's, and that other third-party lead generators may have made additional robocalls on behalf of Defendants' sales representatives as well. *Id*. at ¶ 5.

Defendants vigorously deny these allegations, deny all liability for the claims made in the litigation, and further deny violating the TCPA or the regulations promulgated under the TCPA. *Id*. at ¶ 18. Specifically, Defendants deny that VSS or any other third-party lead generators had actual or apparent authority to place calls on Defendants' behalf, and further deny that Defendants would have liability for the actions of those sales agents who used such lead generation services, or that those sales agents would have liability for VSS's telemarketing practices. *Id*. Finally, Defendants allege that discovery has established that Defendants' corporate policies expressly prohibit the use of outside lead generation, and that if Defendants' sales agents utilized VSS's telemarketing services, they did so without Defendants' knowledge or consent. *Id*.

The litigation has been intensive and hard-fought, has included extensive investigation into Plaintiff's allegations and has had nearly a full year of discovery, including the exchange of documents, preparation and responses to requests for production of documents and interrogatories, subpoenas on multiple relevant third parties, the deposition and informal

interview of dozens of current and former representatives of Defendants, as well as multiple briefed and litigated discovery disputes that were heard by this Court over the course of the past year.  *Id*. at ¶ 8.

At the same time, the Parties simultaneously engaged in arms' length negotiations for a comprehensive resolution of this litigation.  *Id*. at ¶ 10.  These negotiations included months of informal settlement discussions between counsel, followed by a formal, all-day mediation in Chicago on July 23, 2019, before a retired judge who the Parties selected specifically because of his significant experience regarding the settlement of claims brought under the TCPA (Hon. Morton Denlow of the mediation firm JAMS).  *Id*.  The formal mediation was followed by several months of continuing negotiations between counsel.  *Id*.  As a result of these significant efforts, the Parties reached a framework for resolution believed by them to be a fair resolution of this dispute, primarily by the creation of a non-reversionary common fund of $975,000 from which claims, administration costs, attorneys' fees, and an incentive award to the Representative Plaintiff would be paid, as well as a substantial and far-reaching notice plan designed to reach as many potential Settlement Class members as possible.  *Id*. at ¶ 12.

As set forth more fully herein, the Agreement is exceedingly fair.  Given the regulatory and legal uncertainty surrounding certain aspects of the underlying TCPA statute and its implementing regulations, in addition to Defendants' agency arguments, Plaintiff acknowledges that he faced complex and potentially significant hurdles at class certification, summary judgment and/or trial.  Given these challenges, coupled with the ability and willingness of Defendants to continue their vigorous defense, the Agreement provides certain recovery for the Settlement Class, and is in the best interests of the Settlement Class as a whole.

Finally, as further support for the reasonableness of the Agreement, this settlement was reached only after substantial litigation, discovery, and arms-length negotiations between experienced counsel, with the guidance and assistance of a well-respected mediator with significant experience regarding the litigation and settlement of claims brought under the TCPA. As such, the Agreement strikes a reasonable balance between: the certain monetary benefit the Settlement Class will receive under this settlement, the fact that Defendant will vigorously oppose the claims asserted in the litigation if the settlement is not approved, and the attendant risks, costs, uncertainties, and delays of litigation.

The Parties agree that the Agreement constitutes a fair, reasonable, and adequate resolution for the Plaintiff and the Settlement Class, pursuant to Rule 23(e)(2) of the Federal Rules of Civil Procedure, and the terms of the resolution, as set forth in the preliminarily approved Agreement, are in the best interests of the Parties.  The Parties therefore request that the Court enter a Final Order and Judgment: (1) granting final approval of the Agreement; (2) certifying the Settlement Class as defined in the Agreement; and (3) entering an Order and Final Judgment, and dismissal of the litigation.[2]

## II.      SUMMARY OF SETTLEMENT AND NOTICE

### A.      The Settlement Class

The settlement has been reached on behalf of the "Settlement Class," which is defined as follows:

> All persons and entities whose telephone numbers were called by third parties that marketed solar energy products and services on behalf or for the benefit of Defendants on or after July 1, 2014 where:
>
> (1) The third-party initiated a call using an artificial voice, or a

---

[2] A proposed final order approving settlement, in the form approved by the Parties, is attached for the Court's convenience and consideration as Exhibit 3.

prerecorded voice, to (i) advertise the commercial availability or quality of any property, goods, or services; or encourage the purchase or rental of property, goods, or services; (ii) where such persons' and entities' telephone numbers were assigned to a cellular phone service or residential line; and (iii) where the third-party failed to obtain Prior Express Written Consent from those persons and entities called; or

(2) The third-party initiated a call using an ATDS to (i) advertise the commercial availability or quality of any property, goods, or services; or encourage the purchase or rental of property, goods, or services; (ii) where such persons' and entities' telephone numbers were assigned to a cellular phone service; and (iii) where the third-party failed to obtain Prior Express Written Consent from those persons and entities called; or

(3) The third-party initiated more than one call within a 12-month period (i) to persons and entities who were registered with the National Do-Not-Call Registry for at least 30 days prior to being called; (ii) encouraging the purchase or rental of property, goods, or services; (iii) where such persons' and entities' telephone numbers were assigned to a cellular phone service; and (iv) where the third-party failed to obtain Requisite Do-Not-Call Permission from those persons and entities called.

The calls referenced in the class definition shall be collectively referred to as "Covered Calls."

Excluded from the Settlement Class are Defendants, any parent, subsidiary, affiliate or controlled person of Defendants, as well as the officers, directors, agents, servants or employees of Defendants and the immediate family members of such persons, the named counsel in this litigation, and any member of their office and/or firm.

### B.    Benefits to Class Members

Defendants, solely for the purposes of settlement and without admitting or conceding any fault, wrongdoing or liability, and in order to avoid the inconvenience and expense of further litigation, agreed to the establishment of a non-reversionary $975,000 common fund that will be used to make class member claimant payments, and to pay notice and administration costs,

attorneys' fees, costs, and expenses, and an incentive award to the Representative Plaintiff ("Settlement Fund").

Once the Parties have obtained final approval from this Court, and the time for appeal has passed or the settlement is finally approved on appeal, the Settlement Administrator will provide each member of the Settlement Class who has submitted a timely and valid claim form with a *pro rata* distribution of the Settlement Fund, in accordance with the Agreement. The Parties received an excellent response from the Settlement Class in reaction to settlement (40,000 valid claims and 0 objections), and as discussed more fully below, both the final claims rate and final class relief mirrors those approved by courts in analogous TCPA cases, and should be similarly approved here.

### C.    Notice

Pursuant to this Court's Updated Preliminary Approval Order, the Settlement Administrator successfully provided notice of the settlement to Settlement Class members through both robust nationwide and publication notice, as well as through direct notice that was sent by first-class U.S. Mail to those identifiable from records obtained in discovery. *See* Rogan Decl., Exhibit 2.

### i.    *Direct Notice*

With regards to direct notice, on December 9, 2019, the Settlement Administrator caused the Postcard Notice, appended as Exhibit 2-C hereto, to be printed and mailed to the 65,979 names and mailing addresses that were identifiable from limited records obtained in discovery (the "Direct Notice Class List"). *Id*. at ¶ 6. The Postcard Notice provided these known Settlement Class Members with a proof of claim form to be returned by Settlement Class members in order to qualify for payment, directed Settlement Class members to a website

application where they could alternatively submit a proof of claim form in order to qualify for electronic payment, and provided contact information for toll-free customer service support.  *See* Exhibit 2-C ("Postcard Notice").

For those Settlement Class Members whose initial Postcard Notice was returned by the USPS with forwarding addresses, the Settlement Administrator immediately caused the Postcard Notice to be re-mailed to the forwarding addresses supplied by the USPS.  *See* Ex. 2 at  ¶ 7.  For those Settlement Class Members whose initial Postcard Notice was returned by the USPS with undeliverable addresses, the Settlement Administrator performed address searches through credit bureau and/or other public source databases, and promptly re-mailed the Postcard Notice to all newly found addresses.  *Id*. at  ¶ 8.

### ii.      *Media and Publication Notice*

With regards to the Settlement Administrator's robust, nationwide media and publication notice program, the Settlement Administrator purchased 340 million impressions to be distributed via Google Display Network and Facebook.  *Id*. at  ¶ 9.  These impressions targeted adults 18 years of age and older, and appeared on both mobile and desktop devices from December 9, 2019, through February 7, 2020.  *Id*.  A total of over 343 million impressions were delivered and distributed.  *Id*.   Screenshots of the internet banner notices as they appeared on various websites are appended as Exhibit 2-E hereto.  *Id*.   Additionally, on December 9, 2019, the Settlement Administrator caused an informational press release, appended as Exhibit 2-F hereto, to be issued to press outlets nationwide via PR Newswire.  *Id*. at  ¶ 10.

### iii.      *Settlement Website and Telephone Hotline*

In addition to the above, on or about December 9, 2019, the Settlement Administrator established a website at [www.VivintSolarTCPASettlement.com](www.VivintSolarTCPASettlement.com), dedicated to this matter to

provide information to the Class Members.  *Id*. at  ¶ 11.  The Settlement Website provided Class Members with downloadable case documents, including the detailed, long form notice (attached as Exhibit 2-D hereto), the ability to submit online claims for electronic payment, frequently asked questions with responses, contact information for Class Counsel and the Settlement Administrator, and other pertinent information.  *Id*.   Links to the Settlement Website were provided in the Postcard Notice, Long Form Notice, Claim Form, and in the advertisements delivered through the Settlement Administrator's nationwide media and publication notice program.   As of the date of this Motion, the website has received 113,472 visits from 87,896 users. *Id*.

The Settlement Administrator has also established and continues to maintain a toll-free telephone number for potential Class Members to call and obtain information about the settlement, request a notice packet, and/or seek assistance from a live operator during regular business hours.  *Id*. at ¶ 12.  The Settlement Telephone Hotline became operational on December 9, 2019, and is accessible 24 hours a day, 7 days a week.  *Id*.  As of the date of this Motion, the Settlement Administrator has received a total of 122 calls to the Settlement Telephone Hotline. *Id*.

    *iv.   CAFA Notification*

Pursuant to this Court's Updated Preliminary Approval Order, and in compliance with the Class Action Fairness Act ("CAFA"), 28 U.S.C. Section 1715, on November 15, 2019, the Settlement Administrator caused fifty-nine (59) CAFA Notice Packets to be mailed via Priority Mail to the U.S. Attorney General, the Attorneys General of each of the 50 states and the District of Columbia, the Attorneys General of the 5 recognized U.S. Territories, as well as parties of interest to this action.  *Id*. at  ¶ 3.  A copy of the cover letter is appended as Exhibit 2-A hereto.

As of the date of this Motion, the Settlement Administrator has received no response from any of the recipients of the CAFA Notice Packet. *Id*. at  ¶ 4.

  *iv.*  *Reaction of the Class*

  The reaction of the Settlement Class subsequent to preliminary approval supports approval.  The Parties received 39,891 timely, valid, and non-fraudulent claims and **zero** objections.  *Id*. at  ¶¶ 16, 18.  As discussed more fully below, this claims rate exceeded the Settlement Administrator's (and thus the Parties') original estimate for claims, is above the acceptable range for claims submissions in other TCPA cases, including those seen by the Settlement Administrator, and is supported by the relevant law, indicating an excellent reaction by the Settlement Class.

  Finally, the Settlement Administrator received only two (2) requests for exclusion (attached as Exhibit 2-G hereto), and zero (0) objections to the settlement.  *Id*. at  ¶¶ 17-18.

  **D.**  **Release of Claims**

  Subject to final approval by this Court, the Released Parties shall be released from the claims of the Releasing Parties in accordance with the terms of the Agreement.

  **E.**  **Incentive Award and Attorneys' Fees**

  Subject to final approval by this Court, the Parties have agreed that the Class Settlement Fund shall also be used to pay (a) an Incentive Award to the Representative Plaintiff in the amount of $20,000.00, in compensation and in recognition of his efforts on behalf of the Settlement Class; and (b) attorneys' fees to Class Counsel in the amount of $325,000.00, an amount equal to one-third of the Settlement Fund, in addition to $27,445.70 in reasonable litigation costs and expenses. As discussed more fully below, these payments are consistent with the nationwide standard in similar class settlements, and should be similarly approved here.

### F.       Court Adoption and Jurisdiction

The Agreement is contingent upon entry of an order giving approval to the terms of the Agreement.  If the Court refuses to grant approval and/or modifies any of the terms of the Agreement, or if the Court's Final Order is reversed or materially modified on appeal, then the attached Agreement shall be terminated (unless the Parties agree otherwise in writing) and neither the fact that the Agreement was made nor any stipulation, representation, agreement or assertion made in the attached Agreement may be used against any Party.

The Parties further agree that the Court shall retain continuing jurisdiction over this Action and the Parties, including all of the Settlement Class Members, the administration and enforcement of the attached Agreement, and the benefits to the Settlement Class.  Any dispute or controversy with respect to the interpretation, enforcement, or implementation of the attached Agreement shall be presented by motion to the Court and determined by the Court.

### III.      FINAL COURT APPROVAL

### A.       The Settlement Class Should be Certified Pursuant to FRCP 23

Rule 23(e), Federal Rules of Civil Procedure, requires judicial approval for any compromise of claims brought on a class basis.  Before certifying a class for the purposes of settlement, this Court must find that the Parties have established the criteria set out in Rule 23(a), and at least one of the subsections of Rule 23(b).  The Court conditionally certified the Settlement Class in its Preliminary Approval Order.[3]

---

[3] *See* Updated Preliminary Approval Order, D.E. 33 at ¶ 3 ("The Court finds that this conditional class certification is appropriate because (a) the Settlement class is so numerous that joinder of all members is impractical, (b) there are common questions of law and fact that predominate over any questions affecting only individual class members, (c) Plaintiff's claims are typical of the claims of the class, (d) Plaintiff and its counsel will fairly and adequately protect the interests of the Settlement Class, and (e) a class action is the superior method for resolving this controversy, given the nature and small size of the class members' individual claims and their lack of interest

**B.      The Agreement is Fair, Reasonable and Adequate**

In addition to Rule 23's requirements, the court must also make a determination on the fairness, reasonableness and adequacy of the settlement terms.   Approval of a proposed settlement is a matter within the broad discretion of the district court.  *See Richardson v. L'Oreal USA, Inc.*, 2013 WL 3216061, \*2 (D.D.C. Jun. 27, 2013) (quoting *In re Vitamins Antitrust Litig.*, No. 99-197, 1999 WL 1335318, at \*5 (D.D.C. Nov. 23, 1999)). *See also Hubbard v. Donahoe*, 2013 WL 3943495, \*2 (D.D.C. July 31, 2013) (same) (citing *Vista Healthplan v. Warner Holdings Co. III*, 246 F.R.D. 349, 357 (D.D.C. 2007)).

A "presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery."  *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 104 (D.D.C. 2004).  While the court generally has discretion to decide whether to approve or reject a proposed settlement, the court's decision is constrained by the "principle of preference" favoring and encouraging settlements in appropriate cases.  *Id.* at 103 (quoting *Pigford v. Glickman*, 185 F.R.D. 82, 103 (D.D.C. 1999)).  It is well established that there is an overriding public interest in settling and quieting litigation, particularly in the context of a class action.  *See Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977); *see also Newberg on Class Actions* § 11:41, at 87 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy."); *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits").   Under this Agreement,

---

in individually controlling the prosecution of separate actions, and that resolution on a class wide basis will promote judicial economy and efficiency."); *see also id.* at ¶ 4 ("The Court further finds that this conditional class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3), because questions of law and/or fact common to members of the Settlement Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.").

members of the Settlement Class who submit valid claims are <u>ensured</u> a benefit, as opposed to "the mere possibility of recovery at some indefinite time in the future." *See In re Domestic Air Transport*, 148 F.R.D. 297, 306 (N.D. Ga. 1993).

In determining whether a proposed settlement is "fair, adequate, and reasonable and not the product of collusion between the parties," courts look to a number of factors, including: "(1) whether the settlement is the result of arm's-length negotiations; (2) the terms of the settlement in relation to the strength of Plaintiffs' case; (3) the stage of the litigation proceedings at the time of settlement; (4) the reaction of the class; and (5) the opinion of experienced counsel." *Hubbard*, 2013 WL 3943495, at *2 (quoting *Vista Healthplan*, 246 F.R.D. at 360); *Schweizer, supra*, at *8 (same) (quoting *In re LivingSocial Mktg. & Sales Practice Litig.*, 2013 WL 1181489, *7 (D.D.C. Mar. 22, 2013)).

As discussed fully herein, a review of these factors clearly demonstrates that the Agreement is fair, reasonable, adequate, and should be finally approved.

### a.  *The Settlement is the Result of Arm's Length Negotiations*

A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms' length negotiations between experienced, capable counsel after meaningful discovery." *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 104 (quoting *Manual for Complex Litig.*, at § 30.42).  Here, the Agreement was executed only after over twelve (12) months of wide-ranging discovery and contentious litigation, followed by several more months of extensive negotiations among experienced counsel, all of whom have devoted considerable time and effort to this litigation and settlement.  Moreover, the Agreement was reached with the assistance of Hon. Morton Denlow (Ret.), a former judge and neutral, third-party mediator with particular and significant experience and expertise regarding the litigation and settlement of

actions brought under the TCPA.  The Parties were able to reach this resolution only after formal, in-person attempts at mediation, as well as several months of continuing negotiations between counsel.

Accordingly, this Court should presume that the settlement reached by the Parties is fair and reasonable.  *See Equal Rights Center v. Washington Metropolitan Area Transit Authority*, 573 F. Supp. 2d 205, 212 (D.D.C. 2008) (class action settlement presumed reasonable where the parties engaged in six months of vigorous negotiations and the litigation was contentious); *see also Reed v. General Motors Corp.*, 703 F.2d 170, 175 (5th Cir. 1983) ("[T]he value of the assessment of able counsel negotiating at arm's length cannot be gainsaid. Lawyers know their strengths and they know where the bones are buried."); *see also In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 351 (N.D. Ohio 2001) ("[W]hen a settlement is the result of extensive negotiations by experienced counsel, the Court should presume it is fair."); *In re NASDAQ Market-Makers Antitrust Litig*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) (citing *Manual for Complex Litigation, Third*, § 30.41 (West 1995)) ("Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted.").

  b. *The Terms of Settlement Reflect the Strength of the Parties' Positions and the Risks of Continued Litigation*

The Parties jointly submit that the proposed settlement is in the best interests of their respective clients and the Settlement Class as a whole, and strikes a reasonable balance between the benefits the Settlement Class will receive under this settlement, the fact that Defendant will vigorously oppose the claims asserted in the litigation if the settlement is not approved, and the attendant risks, costs, uncertainties and delays of litigation.

In evaluating a proposed class action settlement, the benefits to the class members must be "considered in juxtaposition with the risks attendant to continued litigation of this matter." *Schweizer, supra*, at *12 (quoting *In re LivingSocial Mktg.*, 2013 WL 1181489, at *9). Here, the settlement should be approved because both Parties recognize the substantial risks of proceeding with the litigation, and the costs in doing so. The parties have extensively analyzed the strengths and weaknesses of their respective positions and the risks, time, and costs of continued litigation, and have determined that there is a material risk that continued litigation would result in a less favorable outcome for the Class Members or increased liabilities for Defendant.

The litigation in this matter has been intensive and hard-fought. Although disputed by Plaintiff, Defendants deny that VSS or any other third-party lead generators had actual or apparent authority to place calls on Defendants' behalf, and further deny that Defendants would have liability for the actions of those sales agents who used such lead generation services, or that those sales agents would have liability for VSS's telemarketing practices. Although disputed by Plaintiff, Defendant has further asserted that Defendants' corporate policies expressly prohibit the use of outside lead generation, and that Defendants' sales agents utilized VSS's telemarketing services without Defendants' knowledge or consent.

Moreover, both Parties acknowledge that certain aspects of the TCPA and its implementing regulations have been the subject of extensive recent discussion and regulatory activity from the FCC. This regulatory uncertainty similarly favors resolution. *See, e.g., In re Capital One Tel. Consumer Prot. Act Litig. (In re Capital One)*, 2015 U.S. Dist. LEXIS 17120, 790-92 (N.D. Ill. Feb 12, 2015) (discussing the "disparate interpretations" of the FCC's TCPA orders, and noting that "the split opinion among practitioners and courts … injects uncertainty into the litigation" and counsels in favor of settlement); *Wilkins v. HSBC Bank Nev., N.A.*, 2015

U.S. Dist. LEXIS 23869, 21 (N.D. Ill. Feb. 27, 2015) (approving TCPA class settlement in part because uncertainty regarding the TCPA "will continue to add significant risk to large TCPA litigation" favoring settlement of such claims).

While Plaintiff and Class Counsel believe that the violations of the TCPA alleged in this matter are clear, and are confident in the merits of their claims, Defendants vehemently dispute this contention.  Both Plaintiff and Class Counsel acknowledge that litigation is inherently unpredictable, and that any adverse ruling on legal issues raised by the Defendants during the litigation of this matter, including, but not limited to, the propriety of class certification, legal standing of the Representative Plaintiff, the possibility of regulatory action from the FCC adverse to Plaintiff's position, the proper interpretation and effect of the TCPA's implementing regulations, and agency, would functionally deny the class any and all relief.  On the other hand, if the class was to be certified, and Plaintiffs prevailed at trial, the potential damages would amount to a significant liability.

As a result of discovery, both Class Counsel and counsel for Defendants had ample foundation upon which to evaluate the proposed settlement.  Each Party, therefore, possessed the necessary information to evaluate the strengths and weaknesses of their respective cases in order to discuss settlement effectively.  Armed with this information, the Parties were able to reach the present settlement only after extensive motion practice, discovery, lengthy settlement discussions, and further negotiations over settlement terms and language.  As such, the Parties jointly assert that the uncertainty of these legal issues makes resolution via settlement desirable, and that the attached Agreement represents a fair, reasonable, and adequate resolution that is in the best interests of all Parties and the Settlement Class.

c. _Settlement was only Reached after Substantial and Vigorous Litigation and Negotiation_

Settlement should come at a time when counsel has "sufficient information to adequately assess the risks of [continued] litigation." *In re Lorazepam & Clorazepate Antitrust Litig., MDL No. 1290*, 2003 WL 22037741, at \*5 (D.D.C. June 16, 2003); *see also Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 565 F. Supp. 2d 49, 57-58 (D.D.C. 2008). Here, given that this settlement was reached after nearly two (2) years of vigorously contested litigation, this factor favors approval. *See In re Lorazepam*, 2003 WL 22037741, at \*5 (approval appropriate where the parties had engaged in "substantial and vigorous litigation"). Further, due to the unique factual circumstances of this case, and the numerous legal issues that have arisen out of those circumstances, the Parties submit that this reasonableness factor particularly favors approval of the Parties' negotiated compromise.

Following significant pre-suit investigation by the Representative Plaintiff that included multiple phone calls and an in-person visit with one of Defendants' employees, Plaintiff alleges that wide-ranging discovery has revealed that the Robocall that Plaintiff alleges he received was placed at the behest of a sales agent of Defendants by VSS, an entity that, at the time, operated a now-defunct call center out of the Philippines, in order to solicit interest in solar energy without initially disclosing Defendants' identity, and to schedule appointments with Defendants' sales representatives. *See* Ex. 1 at ¶ 4. Plaintiff also alleges that discovery has revealed that many of Defendants' employees, ranging from salespersons to Regional Directors, were using VSS's robocalling services, resulting in the Robocalls made to the Class in order to set appointments for Defendants and their employees, and that these employees were involved in many facets of VSS's marketing efforts, including selecting the zip codes to which calls were placed, mandating the times and dates during which sales appointments could be set, dictating the prequalification

17

information that VSS's agents were to obtain from the called parties, and helping to generate the information used in the Robocalling scripts. *Id*. at ¶ 5. Finally, Plaintiff believes that discovery has also revealed that the calls at issue were placed using an Automated Telephone Dialing System (ATDS) with the use of Avatar/Soundboard technology, which Plaintiff alleges constitutes a prerecorded voice under the TCPA. *Id*. at ¶ 6.

In order to obtain this information, Plaintiff and Class Counsel had to engage in significant investigation and formal discovery efforts, which included not only the typical exchange of documents and preparation and responses to requests for production of documents and interrogatories, but also extraordinary efforts to determine the identity of the overseas Robocaller, the specific equipment used to place the Robocalls at issue, and, to the extent possible, the identity of the members of the class. *Id*. at ¶ 7. These extraordinary efforts included the deposition and informal interview of dozens of current and former representatives of Defendants as well as their contacts at VSS; the use of investigative teams and local attorneys in both the United States and in the Philippines in order to identify and locate Defendants' sales agents' overseas contacts as well as the relevant principals of VSS and the operator of the overseas call center at issue; and the issuance of subpoenas on numerous relevant third parties, including banks, credit card companies, and a number of shell corporations designed to hide VSS's identity, in an effort by Plaintiff and Class Counsel to trace payments made by Defendants' employees to relevant third parties. *Id*. at ¶ 8. Moreover, while discovery initially revealed that the records associated with Defendants' sales agents' use of VSS and its Robocalling services had either been destroyed or were located in the Philippines and were thus inaccessible subsequent to the dissolution of VSS, Plaintiff contends that these extraordinary discovery efforts nonetheless resulted in the production of unique identifying information for

approximately 66,000 individuals, produced by the former operator of the VSS's call center in the Philippines, who were called through a portion of VSS's marketing efforts on behalf of Defendants during a specific time frame for which records were still available. *Id*. at ¶ 9.

Defendants vehemently dispute these allegations. As noted above, Defendants deny that VSS or any other third-party lead generators had any actual or apparent authority to place calls on Defendants' behalf, and further deny that Defendants would have any liability for the actions of those sales agents who used such lead generation services, or that those sales agents would have liability for VSS's telemarketing practices. *Id*. at ¶ 18. Defendant has further asserted that Defendants' corporate policies expressly prohibit the use of outside lead generation, and that Defendants' sales agents utilized VSS's telemarketing services without Defendants' knowledge or consent. *Id*.

The Parties submit that there has been more-than-sufficient factual development in this case to allow the Parties to make a meaningful decision as to settlement, and that each Party therefore possessed the necessary information to evaluate the strengths and weaknesses of their respective cases in order to discuss settlement effectively.

### d. *The Reaction of the Class Warrants Approval*

The reaction of the Settlement Class also favors approval. Given the unique factual circumstances of the case as detailed above, the Parties went above and beyond in their class notification efforts in order to reach as many potential Class Members as possible. This included direct mail notice to the 65,979 persons that were identifiable from limited records obtained in discovery, as well as a robust, 60-day nationwide media and publication notice campaign including the purchase of 340 million online impressions designed to reach other class members. *See* Ex. 2 at ¶¶ 6-9.

As a result of these efforts, the Parties received 39,891 timely, valid, and non-fraudulent claims and **zero** objections.  *Id*. at ¶¶ 16, 18.  The absence of any meaningful objection by class members – here, the complete absence – is one of the most important factors in evaluating the fairness, reasonableness and adequacy of the settlement and supports approval of the settlement. *See Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1328 (S.D. Fla. 2007) (citations omitted) ("The reaction of the class is an important factor in gauging whether a settlement is fair, reasonable and adequate.  While a low percentage of objections points to the reasonableness of a proposed settlement, a high percentage of objections signals that a proposed settlement is not fair or reasonable."); *Association for Disabled Americans v. Amoco Oil Co*., 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("[a] small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness."); *Austin v. Pennsylvania Dept. of Corrections*, 876 F. Supp. 1437, 1458 (E.D. Pa. 1995) ("Because class members are presumed to know what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider.").

Moreover, the 39,891 timely, valid, and non-fraudulent claims received constitutes a final claims rate that is well above the acceptable range for claims submissions in other TCPA cases, including those seen by the Settlement Administrator and supported by the relevant law, also supporting approval.  *See* Rogan Decl., Exhibit 2 at ¶ 19 ("[A]pproximately 7.98% of the Class Members filed valid claims and are preliminarily approved for payment.  This claims rate is well within the range of other similar TCPA settlements that KCC has administered."); *see also Drug Reform Coordination Network, Inc. v. Grey House Publishing, Inc.*, No. 1:14-cv-00701 (D.D.C. February 10, 2017), Docket No. 62 (grating final approval with a 2.2% claims rate); *Bayat v. Bank of the West*, 2015 U.S. Dist. LEXIS 50416, *15-16, 2015 WL 1744342 (N.D. Cal. Apr. 15,

2015) (granting final approval with a 1.9% claims rate"); *id.* (citing *Arthur v. SLM Cor.*, No. C10-0198 JLSR (W.D. Wash. Aug. 8, 2012), Docket No. 249 at 2-3 (claims rate of approximately 2%)); *Barani v. Well Fargo Bank, N.A.*, No. 12-cv-02999, Dkt. 32 at *5-6 (S.D. Cal. Mar. 6, 2015) (granting approval of 1.17% claims rate).

      e.  *The Parties' Counsel Believe That The Settlement Is Fair And Reasonable*

The opinion of experienced counsel "should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement." *In re Lorazepam*, 2003 WL 22037741 at *6; *see also Radosti*, 717 F. Supp. 2d at 57. Counsel for the class have substantial experience litigating TCPA class actions, and significant experience litigating class action matters of similar size, scope, and complexity to the instant action. *See* Ex. 1 at ¶ 16. Counsel strongly believe and represent that, given the risks attendant to further litigation, the terms of the proposed settlement are fair and reasonable and in the best interest of the class. *See Equal Rights Center*, 573 F. Supp. 2d at 213.

As discussed more fully above, this case presented unique and complicated factual and legal issues. On one hand, Plaintiff alleges that the results of his wide-ranging discovery uncovered many of Defendants' employees who were using VSS's Robocalling services, resulting in the Robocalls made to the Settlement Class on Defendant's behalf, and that those Robocalls were made using a prerecorded voice and software that constitutes an ATDS. *Id.* at ¶ 18. Moreover, although the Parties acknowledge that many relevant records in the case may have either been destroyed, are located internationally, or are no longer available due to the dissolution of VSS, Plaintiff alleges that, at a minimum, he has identified approximately 66,000 individuals who were Robocalled in this fashion. *Id.* at ¶ 9.

On the other hand, Defendants contend that they have significant legal authority that neither VSS nor any other third-party lead generators would be found to have actual or apparent authority to act on Defendants' behalf, and that if Defendants' sales agents were utilizing VSS's services, Defendants had no knowledge whatsoever of such conduct. *Id*. at ¶ 18. If these arguments prevailed at trial in this matter, the Class could be denied any and all relief; conversely, if the class was to be certified over Defendants' objections, and Plaintiff prevailed at trial, the potential exposure for Defendants could be tremendous.

Finally, during the pendency of and subsequent to the Claims Period, both Parties and the Settlement Administrator worked in tandem in order to ensure that submitted claim forms were valid, non-duplicate, and non-fraudulent, ensuring that legitimate Class Members receive as much as possible from the Settlement Fund. *Id*. at ¶ 15. As detailed more fully in the attached Declaration of Karen Rogan, this included the screening of all claims for certain indicia of fraud as developed by KCC over the course of the thousands of settlements that they have administered, including, but not limited to, multiple claims with different physical addresses but identical, non-public IP addresses, as well as claims submitted from identical IP addresses that utilize special characters in order to avoid fraud detection. *See* Ex. 3 at ¶ 15. Moreover, subsequent negotiations between counsel for the Parties and the Settlement Administrator subsequent to the close of the Claims Period resulted in a nearly $25,000 reduction in the cost of administration; funds that will be directly used to increase each Class Member's individual payout. *See* Ex. 1 at ¶ 15.

Rather than face the significant risks attendant to further litigation, particularly given the unique factual and legal circumstances of this case, the certainty of the final amount payable to each Settlement Class Member provides certain recovery to Class Members who would

otherwise be unlikely to recover individual relief.   Pursuant to the Parties' Agreement, each

Class Member who submitted a timely and valid claim form will receive an initial distribution of

approximately $8.36.   *See* Ex. 3 at ¶ 19.   The Settlement Administrator will then make a second

*pro rata* distribution of remaining Class Settlement funds after the return of un-cashed checks

from the initial distribution, increasing each Class Member's individual payout.   *See id*.   As such,

while the final amount payable to Class Members will not be known until after final approval has

been granted by the Court and the Settlement Administrator has administered the first round of

distributions, it is certain to be above the amount provided in the Parties' initial distribution,

which equals or exceeds amounts approved by courts in analogous TCPA cases, and should be

similarly approved here.   *See, e.g., Mahoney v. TT of Pine Ridge, Inc.*, Case No. 17-80029-CIV,

2017 U.S. Dist. 13 LEXIS 217470, at *18 (S.D.Fla. Nov. 17, 2017) (giving final approval to

TCPA settlement where class members were given a $4.00 cash award); *States of New York &*

*Maryland v. Nintendo of Am., Inc.*, 775 F. Supp. 676, 681 (S.D.N.Y. 1991) (approving a

settlement awarding each class member a $5.00 coupon); *Maxwell Goldschmidt v. Rack Room*

*Shoes, Inc.*, Case No. 1:18-cv-21220-KMW (S.D. Fla. 2020) (approving a settlement awarding

each class member a cash award of $5.00); *Wilkins v. HSBC Bank Nevada, N.A.*, 2015 U.S. Dist.

LEXIS 23869 (N.D. Ill. Feb. 27, 2015) (approving settlement of $2.95 per class member).

     **C.**    **The Class Counsel and Class Representative Awards are Fair and Reasonable**

          *i.*    <u>*Class Counsel Award*</u>

The Supreme Court has recognized that "a reasonable fee is based on the percentage of

the fund bestowed on the class."   *Blum v. Stenson*, 465 U.S. 886, 900 (1984); *see also Boeing*

*Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (Since the 1880s, "this Court has recognized

consistently that a litigant or lawyer who recovers a common fund for the benefit of persons

other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."); *In re Dep't of Veterans Affairs (VA) Data Theft Litig.*, 653 F. Supp. 2d 58 (D.D.C. 2009) ("In [the D.C.] Circuit, the 'percentage-of the fund method [rather than the lodestar method] is the appropriate mechanism for determining the attorney fee award in common fund cases.'"); *Waters*, 190 F.3d at 1297 ("[T]he Supreme Court settled this question by ruling that class counsel are entitled to a reasonable fee based on the funds potentially available to be claimed, regardless of the amount actually claimed.").

Awards of attorneys' fees based on a percentage of the total Settlement Fund, such as here, serve the dual purpose of encouraging redress of damages caused to an entire class of persons, and discouraging similar future misconduct:

> [C]ourts … have acknowledged the economic reality that in order to encourage 'private attorney general' class actions brought to enforce the [laws] on behalf of persons with small individual losses, a financial incentive is necessary to entice capable attorneys, who otherwise could be paid regularly by hourly-rate clients, to devote their time to complex, time-consuming cases for which they may never be paid.

*Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 679, 687 (M.D. Ala. 1988); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993) ("This Court has reiterated the Supreme Court's warning that '[a] request for attorney's fees should not result in a second major litigation.' … It is much easier to calculate a percentage-of-the-fund fee than to review hourly billing practices over a long, complex litigation.").

The percentage of the Class Settlement Fund that Defendant has agreed to pay to Class Counsel as reimbursement for fees and costs reflects the significant efforts put forth by Class Counsel throughout its vigorous prosecution of this matter and is consistent with the nationwide 33% standard in similar class settlements. *See, e.g., In re Dep't of Veterans Affairs (VA) Data Theft Litig.*, 653 F. Supp. 2d 58, 61 (D.D.C. 2009) ("Fees in [the D.C.] Circuit mirror the

24

nationwide numbers"); *Wolff v. Cash*, 2012 U.S. Dist. LEXIS 153786, 15-16 (S.D. Fla. Sept. 26, 2012) ("The average percentage award in the Eleventh Circuit mirrors that of awards nationwide—roughly one-third.") (citing *Waters v. Int'l Precious Metals Corp., et al.*, 190 F.3d 1291, 1291 (11th Cir. 1999)) (awarding one-third on a $40 million recovery in line with nationwide averages); *Goans Acquisition, Inc.*, Case No. 0931-cv-17797 (approving class counsel award of one-third of settlement fund ($2,076,666.66) in TCPA case); *see also In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 U.S. Dist. LEXIS 12344, 2003 WL 22037741 (D.D.C. June 16, 2003) (approving class counsel award of 30%).[4]

### ii.    *Class Representative Award*

As noted above, throughout this case and prior to its filing, the Representative Plaintiff has expended substantial time and effort on behalf of the Settlement Class and to its benefit. *See* Ex. 1 at ¶ 17.  Mr. Rogers performed the initial investigation that led to the identification of Defendants and the discovery of the telemarketing practices that underlie this lawsuit, which included an in-person meeting with a sales representative of Defendants and subsequent investigation and research. *Id*.  Throughout discovery, Mr. Rogers sat for a deposition, reviewed deposition testimony and records obtained by Plaintiff's counsel, and responded to Interrogatories and Requests for Production of Documents. *Id*.  Throughout the Parties' attempts

---

[4] Class Counsel's requested fee award is also fair, reasonable and adequate under the Fifth Circuit's factors for evaluating a reasonable percentage award, as noted by the D.C. Circuit in *Swedish Hosp. Corp. See Swedish Hosp. Corp.* 1 F.3d at 1266 (Holding that courts may consider any of the following factors: "(1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.").

at settlement, Mr. Rogers was consulted and had input in the eventual successful negotiation of favorable terms for Settlement Class members.  *Id*.

Plaintiff's incentive award promotes a public policy of encouraging individuals to undertake the responsibility of representative lawsuits, and reflects the time, cost, and effort that Plaintiff has committed to this matter in order to bring relief to the class and is comparable to similar incentive awards in TCPA cases.  *See, e.g., Benzion v. Vivint, Inc.*, No. 12-cv-61826-WJZ, 2015 U.S. Dist. LEXIS 179532 (S.D. Fla. Feb. 23, 2015) (ECF No. 201) (awarding $20,000 incentive award in TCPA class settlement); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, l30 F.R.D. 366, 374 (S.D. Ohio 1990) (awarding two incentive awards of $55,000 and three incentive awards of $35,000); *Bogosian v. Gulfoil Corp.*, 621 F. Supp. 27, 32 (E.D. Pa. 1985) (incentive awards of $20,000 to each of two plaintiffs).

The Parties thus request that the Court award Plaintiff the amount of $20,000 in support of its active service as Class Representative, as detailed in the Agreement and as preliminarily approved by this Court.  Class representative payments "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006); *see also Ingram v. Coca-Cola, Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (same). "[T]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action." *David v. American Suzuki Motor Corp.*, 2010 WL 1628362, 6 (S.D. Fla. 2010); *Altamonte Springs Imaging v. State Farm Mutual Automobile Insurance Co.,* 12 So. 3d 850, 857 (Fla. 3d DCA 2009) ("The position as fiduciary for the class is less an honor than a headache. The representative plaintiff is identified as a class litigant in public records (potentially affecting credit reports and disclosures for financing), is subject to

fiduciary duties to the class, may be deposed and required to produce records, and must meet with counsel and appear in court.").

As such, and in light of the above, the Parties jointly request that this Court find that the Class Counsel and Class Representative awards, as outlined in the Agreement and as preliminarily approved by this Court, are fair, reasonable and adequate, and enter them as part of the final judgment in this case.

## IV.   CONCLUSION

WHEREFORE, for all of the foregoing reasons, the Parties jointly request the Court's entry of an Order and Final Judgment:

(1) granting final approval of the proposed settlement as set forth in the Agreement;[5]

(2) certifying the Settlement Class pursuant to Rule 23(a) and (b)(3), Federal Rules of Civil Procedure;

(3) approving payments to the Settlement Class, Class Counsel and Class Representative as set forth in the Agreement;

(4) approving payment to the Class Administrator as set forth in the Agreement;

(5) dismissing the action; and

(6) providing such other and further relief as the Court deems just and reasonable.

---

[5] Pursuant to the Agreement, if approved, Defendants have agreed to deposit the $975,000 into an interest bearing account held by the Settlement Administrator within thirty (30) days after entry of the Final Approval Order by this Court.  Due to significant delays caused by the COVID-19 pandemic and stay-at-home orders, Defendants have requested sixty (60) days within which to deposit the necessary funds.  Plaintiff has no objection to this request.  As such, the Parties request that the Court delay the effective date of its Final Approval Order by thirty (30) days, in order to provide Defendant with the requested time and allow the Parties to remain in compliance with the Agreement.  If granted, the Parties agree that such a modification does not constitute a substantive change of any material term of the Agreement.

Respectfully submitted:


Shawn A. Heller, Esq.
D.C. Bar No. 985899
shawn@sjlawcollective.com
Social Justice Law Collective, PL
974 Howard Avenue
Dunedin, Florida 34698
Tel:  (202) 709-5744

Peter Bennett
D.C. Bar No. 1016919
peterbennettlaw@gmail.com
Richard Bennett, Esq.
Florida Bar No. 150627
Richardbennett27@gmail.com
Bennett & Bennett
1200 Anastasia Ave., Ofc 360
Coral Gables, Florida 33134
Tel:  (305) 444-5925

*Attorneys for Plaintiff*

By: /s/ *Shawn A. Heller*
        Shawn A. Heller


Steven A. Augustino
D.C. Bar No. 439987
KELLEY DRYE & WARREN LLP
3050 K Street, NW, Suite 400
Washington, D.C. 20007
Telephone: (202) 342-8400
Fax: (202) 342-8451
Email: saugustino@kelleydrye.com
Email: bstern@kelleydrye.com

Lisa A. Messner
D.C. Bar No. OH0039
Mac Murray & Shuster, LLP
6530 West Campus Oval, Ste. 210
New Albany, Ohio 43054
Telephone:  (614) 939-9955
Fax: (614) 939-9954
Email: lmessner@mslawgroup.com

Attorneys for Defendants

By: _ s/ Steven A. Augustino _____
           Steven A. Augustino

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, on this 22nd day of May, 2020, which will send a notice of electronic filing to all attorneys of record.

By: /s/ Shawn A. Heller _____
           Shawn A. Heller, Esq.